UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

NIKET JAIN,

Defendant.

Docket No.: 19-cr-059 (PKC)

**POST-HEARING MEMORANDUM SUBMITTED ON BEHALF OF NIKET JAIN TO DISMISS THE INDICTMENT,**

**AND, IF NECESSARY, MOTIONS FOR:**

**A) AN ORDER REQUIRING THE PRODUCTION OF ADDITIONAL *BRADY* MATERIAL; AND**

**B) FOR THE COURT TO INSPECT GRAND JURY MINUTES *IN CAMERA***

**EMMET, MARVIN & MARTIN, LLP**
120 Broadway
New York, New York 10271
(212) 238-3000
*Attorneys for Defendant Niket Jain*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

SUMMARY OF AUGUST 12, 2020 HEARING .......... 5

A. Testimony of FBI Agent Wayne Boddy and AUSA Tara La Morte .......... 5

1. Testimony of Agent Boddy .......... 5

2. Testimony of AUSA Tara La Morte .......... 10

a. Failure to Disclose the Semen Kaplan Declaration .......... 12

b. Failure to Disclose the Devices .......... 16

c. Disclosure of the Devices .......... 18

I THE INDICTMENT SHOULD BE DISMISSED FOR A VIOLATION OF DUE PROCESS, THE DEPRIVATION OF THE COUNSEL OF CHOICE AND PURSUANT TO THE SPEEDY TRIAL ACT .......... 21

II THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE BRADY MATERIAL .......... 24

III THE COURT SHOULD ORDER PRODUCTION OF GRAND JURY MINUTES FOR ITS IN CAMERA INSPECTION .......... 24

CONCLUSION .......... 28

**<u>TABLE OF AUTHORITIES</u>**

CASES

*Government of Virgin Islands v. Fahie*,
419 F.3d 249 (3d Cir. 2005)........................................................................................ 22

*United States v. Bundy*,
2020 WL 4517572 (9th Cir. Aug. 6, 2020)........................................................... 22, 23

*United States v. Connolly*,
16 Cr. 370, 2019 WL 2120022 (S.D.N.Y. May 2, 2019) ........................................................ 23

*United States v. Forde*,
740 F.Supp.2d 406, 413 (S.D.N.Y. 2010)........................................................................ 26

*United States v. Hoey*,
No. S3 11-CR-337 PKC, 2014 WL 2998523 (S.D.N.Y. July 2, 2014) ................................ 26

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012)................................................................................... 22, 23

*United States v. Meregildo*,
920 F.Supp.2d 434 (S.D.N.Y. 2013).............................................................................. 23

*United States v. Moten*,
582 F.2d 654 (2d Cir.1978)........................................................................................ 26

*United States v. Palmisano*,
104 F.3d 354 (2d Cir. 1996)........................................................................................ 22

*Youngblood v. West Virginia*,
547 U.S. 867 (2006)................................................................................................ 22

RULES AND REGULATIONS

Fed. R. Crim. P. 16 ................................................................................................ 19

## PRELIMINARY STATEMENT

On January 28, 2019, the prosecution team, composed of the Federal Bureau of Investigation (the "FBI") and the United States Attorney's Office for the Southern District of New York (the "USAO"), working together obtained an indictment (the "Indictment") alleging that the Defendant Niket Jain (the "Defendant") engaged in a scheme with a co-conspirator, "Individual-1," Joseph Krigsfeld, using an "Investment Company," Aberon Capital Management ("Aberon"), allegedly to defraud two investors, "Investor-1" and "Investor-2," not by misappropriating funds, but by, it was alleged, not accurately providing reports on the investment performance of Aberon to these investors.

The Defendant was arrested on January 29, 2019. Then, for over one year, until a few weeks before the trial that had been scheduled for March 30, 2020, the prosecutorial team deliberately withheld from the Defendant evidence that it believed showed that the purported "Investor-1" actually was a money laundering operation, in which (a) Krigsfeld, (b) a Russian organized crime member and high-level international money launderer Leon Lann, also known as Leon Kaplan and by other names, (c) Semen Kaplan, (d) Victoria Krain, also known by a host of other names, and others, were co-conspirators. The deliberately withheld evidence showed that the purported false reporting alleged in the Indictment was not a scheme to defraud "investors," it was perpetrated by and for the benefit of the members of the international money laundering operation, of which there is no dispute Niket Jain was not part and had no knowledge, to prevent disclosure of their money laundering scheme, primarily in Europe, it appears. This evidence, therefore, was deliberately withheld by the Government for the purpose of depriving the Defendant of evidence that the scheme to defraud alleged in the Indictment did not exist and that Krigsfeld

was not a co-conspirator with the Defendant in any such scheme, which would show the Defendant's innocence to the charges obtained from the Grand Jury.

The prosecutorial team's deliberate suppression of this evidence unraveled slowly and likely continues to be hidden in significant parts. Instead of forthrightly providing an account of the Government's determination to suppress the evidence - which were two computers and a telephone in the possession of Krigsfeld taken by the FBI in consultation with the USAO on October 9, 2019 (the "Krigsfeld Devices"), and the Declaration of Semen Kaplan presented to the Securities and Exchange Commission ("SEC") prior to April 2018 - the government team choose to obfuscate and attempt to avoid disclosure of its intentional suppression, which conduct continued at the August 12, 2020 hearing. As seen at the hearing and summarized below, the evidence is that the governmental team intentionally hid what it believed to be, and is, exculpatory evidence for over one year, and then tried to avoid the implications of this through numerous incredible and coordinated representations, including but not limited to:

- that the FBI could not contact Leon Kaplan/Lann, the individual whose money is called "Investor-1" in the Indictment, or his fronts Semen Kaplan and Victoria Krain, because they were not in the United States, so that it was not even worth the time to try;
- that the FBI claimed that it was waiting until the trial of Niket Jain was over to even look at the co-conspirator's Aberon work computers and telephone, because the FBI Case Agent works on only one investigation at a time, and the Aberon work computers were some other investigation, not this one;

- the FBI agent had a policy of not telling Assistant United States Attorneys ("AUSA") about evidence in FBI possession unless specifically asked to produce discrete items, and otherwise will remain silent regarding such evidence;
- the AUSA in the Southern District of New York, in the Securities Fraud and Money Laundering Section, acting as lead prosecutor in this securities fraud case, would not ask the FBI Case Agent on the prosecutorial team what evidence had been gathered in an investigation, but, instead, would indict an individual for alleged federal crimes and prosecute him for well over one year, without ever asking the FBI Case Agent, or his successor, what relevant evidence existed;
- further, that the lead prosecuting AUSA, without making any inquiry of the FBI about what evidence exists in this case for over one year would represent to the Court and the Defendant that all discovery had been produced, that the prosecutorial team is aware of its *Brady* obligations to produce all exculpatory evidence, had complied, and that there is none; and
- finally, after suppressing the exculpatory Declaration of Semen Kaplan, but it being discovered anyway, making no effort of substance to find out how this suppression happened or who was responsible, which would have been the first thing done, unless the participants already knew that it had been intentionally withheld from the Defendant, and why.

There was substantially more proof of deliberate withholding of discovery, because it was believed to be exculpatory, adduced at the hearing and in the record in this case, and it is further summarized below. This evidence shows that the suppression of the evidence for over one year was deliberate.

As set forth previously and below, this constitutes a violation of Due Process and the appropriate remedy here is dismissal of the Indictment,[1] which is further appropriate because the prosecutorial team's deliberate acts caused the denial of the Defendant's right to counsel of choice and repeated violation of the Speedy Trial Act.

The Government also continues to withhold *Brady* information. Thus, if this case were to continue, it is respectfully requested that an Order be issued requiring the production of additional *Brady* material, including all evidence of the use of Aberon by Joseph Krigsfeld, Leon Lann/Kaplan, Semen Kaplan, Victoria Kraine and their associates and coconspirators for the purposes of money laundering. Further, because the record establishes the intentional suppression of exculpatory evidence that the identity of "Investor-1" in the Indictment was Leon Lann/Kaplan operating through a front, the Defendant respectfully moves for the Court to inspect the Grand Jury minutes *in camera* to determine what representations were made to the Grand Jury regarding the identity of "Investor-1."

Set forth below, are, first, summaries of the testimony of Agent Boddy and AUSA La Morte, and further analysis showing that: a) the suppression of the Devices was deliberate; b) the withholding was part of the effort by the FBI and USAO to structure discovery to prevent disclosure of *Brady* material, which was evidence that Aberon was a money laundering enterprise for the benefit of a Russian organized crime member; c) the witnesses continued to attempt to hide these facts during the Court's inquiry into the withholding of the Devices from the Defendant and during the August 12, 2020 hearing; and d) the USAO continues in this conduct to the present.

[1] On March 3, 2020, at a conference in this case, the Court stated that it would perform an inquiry into the Government's actions, and if it found that the Government had deliberately withheld the data on the two computers and a telephone of its cooperating witness Joseph Krigsfeld (the "Devices"), the Court could dismiss the Indictment. (Dock. No. 96, March 3, 2020 Transcript at 15).

Set forth second below is a discussion setting out that the Court previously correctly determined that the deliberate suppression of evidence in this case could require dismissal of the Indictment, and that not only has such deliberate suppression been shown, but it further has been established that it was for the purpose of depriving the Defendant of evidence constituting exculpatory *Brady* material, and that dismissal of the Indictment is appropriate.

Set forth third, below, is a motion for an Order that the Government produce all *Brady* material in its possession. This is the subject of the supplemental submission under seal.[2]

Fourth and finally, set out below is a motion that this Court Order the production of Grand Jury material *in camera* for its review, regarding evidence presented to the Grand Jury on the purported identity of "Investor-1," to prevent the Defendant from being tried on charges not returned by a Grand Jury.

## SUMMARY OF AUGUST 12, 2020 HEARING

### A. Testimony of FBI Agent Wayne Boddy and AUSA Tara La Morte

1. Testimony of Agent Boddy

Agent Wayne C. Boddy's testimony and his April 24, 2020 declarations submitted prior to the hearing, and admitted into evidence at the August 12, 2020 hearing as Exhibits 1 and 2, state that he believed that the Krigsfeld Devices had evidence of money laundering, but that he nevertheless determined to suppress the Devices in this case, and determined to not review them

[2] After the hearing in this case the Government disclosed further, skeletal, *Brady* information regarding the use of Aberon by Krigsfeld, Kaplan/Lann and others for money laundering, but then refused to disclose this information fully or to disclose additional exculpatory evidence in its possession. As the defense understands it, the Government has requested that any effort by the defense to have the Court order the production of *Brady* material in this regard be provided to the Court under seal. Additional argument, therefore, regarding the withholding of exculpatory evidence and support for an Order, if necessary, requiring its production, is set forth in a supplemental section of this memorandum respectfully submitted under seal.

until this case is over. That Aberon was a part of a money laundering conspiracy is exculpatory to the Defendant, and Agent Boddy's actions were intended to suppress this evidence.

The reasons and circumstances offered by Agent Boddy to explain why he concluded that there was no need to produce the Devices, it is submitted, were not credible. While he never reviewed the Devices, he testified that he did not produce them because he believed that there was no evidence relevant to the Defendant on the Devices, a conclusion clearly without basis. (August 12 Tr. at 104-105, 107-109). His explanation on why he never mentioned the Devices to AUSA Tara La Morte was because she did not ask for this evidence, and in Agent Boddy's experience he only produces items AUSAs specifically ask for. (*Id*. at 104). Neither of these explanations is credible for multiple reasons.

First, that the Devices were relevant evidence in this prosecution is obvious and cannot be reasonably disputed. As Agent Boddy testified, this was the "Aberon" investigation. Aberon is the "Investment Company" alleged in the first sentence of the Indictment as the entity through which the purported scheme to defraud was perpetrated. The two computers at issue were the Aberon work computers for the sole cooperating witnesses, Joseph Krigsfeld. (August 12 Tr. at 133-134). The October 10, 2018 email from Joseph Krigsfeld's lawyer David Gourevitch, to Agent Boddy (which was forwarded to AUSA La Morte) stated and confirmed that information pertaining to Aberon was on the computers. (Exhibit 3). Agent Boddy and the FBI took possession of the Devices because they were part of their investigation of Aberon. (August 12 Tr. at 109-110).

While Agent Boddy testified in response to leading questions from the Government that that Krigsfeld told him that there was nothing relevant to Jain on the Devices, this is not credible, is inconsistent with his previous testimony, and obviously not accurate - the computers were

Krigsfeld's work computers. (Exhibit 2, Boddy Supplemental Declaration at ¶ 5; *see* August 12 Tr. at 134 [testimony of AUSA La Morte). In fact, contrary to being told that there was nothing relevant to Niket Jain on the computers, Agent Boddy testified that he never asked Krigsfeld whether there was information regarding Aberon on the computers at all. (August 12 Tr. at 109-110). In any event, there could be and was no basis to never look at the computers, except that a decision had been made to not produce any evidence on them, which Agent Boddy believed included evidence of money laundering using Aberon. (August 12 Tr. at 108-109)(Agent Boddy testimony that he "associated" the Devices with the money laundering investigation, so did not produce them for that reason).

Further, the statement by Agent Boddy that he did not provide the Devices to AUSA La Morte because she did not ask, it is submitted, is not credible. The FBI Case Agent, integral to the prosecutorial team, would bring to the attention of the lead prosecutor the existence of the electronic devices of the only co-conspirator and only cooperating witness, unless a decision was made to not disclose the evidence. In fact, that Agent Boddy never reviewed the data on the computers from October 2018 to February 2019, when discovery was collected and provided, or any time after that, shows that the Devices were not withheld because AUSA La Morte did not ask for them, but because Agent Boddy, a leader of the prosecutorial team, intended to not produce them. (*Id*.).

Also not supported as credible in the record is the testimony by Agent Boddy that he believed that the only relevant evidence on the Devices was of money laundering relating to cash transfers after Jain left Aberon, and thus not relevant to this case. (August 12 Tr. at 122-124). There is nothing in the FBI 302s that supports this. Instead the 302s in evidence show the opposite. The October 3, 2018 302, which is Exhibit 3, shows that Agent Boddy was told that the funds

invested in Aberon from 2009 to 2011, when the Defendant worked there, were from Leon Lann/Kaplan a member of Russian organize crime who at that time was being prosecuted for money laundering in a similar scheme in Spain. (August 12 Tr. at 70, 72-73; Exhibit 6 at 5). Thus, when Agent Boddy made the decision to withhold the Devices from the Defendant, Agent Boddy had every reason to believe that the Devices held exculpatory evidence, including that unbeknownst to Jain, Krigsfeld was engaged in a money laundering conspiracy with the purported "Investor-1" in the Indictment.

Agent Boddy's further statement, in response to the Court's question, that he did not review the Devices because he believed that they held money laundering evidence, and that he determined to wait until the end of the prosecution of Niket Jain - including the trial - to look at the Devices, is submitted makes no sense and on this record cannot be credible. (August 12 Tr. at 121-122). It is not supportable to assert that an FBI Agent would wait an indefinite time to look at evidence in one case until some other case, which he claims is unrelated, is complete. Further showing that this explanation is not accurate, Agent Boddy testified that he was transferred from C43, the securities fraud/money laundering squad, did not take this case with him, but never even told the successor case agent about the Devices (August 12 Tr. at 62-63). This proves that Agent Boddy was not waiting for the end of the Jain prosecution, which itself could have no justification, but had no intention that he or his successor or anyone in the New York Field Office ever would review the evidence on the Devices. Accordingly, it is submitted that the only reasonable conclusion from this evidence is that Agent Boddy believed that evidence of the use of Aberon for money laundering by Krigsfeld with the purported "Investor-1" was on the Devices, that he knew or should have known that it was exculpatory to the Defendant, and Agent Boddy determined to permanently suppress it in this case.

Showing further that Agent Boddy, together with the USAO, determined to suppress any exculpatory evidence of the use of Aberon by Krigsfeld and "Investor-1" as a money laundering enterprise is that Agent Boddy, together with the USAO, never even attempted to contact any purported "victim" providing 99% of the funds invested in Aberon -"Investor-1." Agent Boddy testified that he never tried to contact Leon Lann/Kaplan, Semen Kaplan or Victoria Krain because, Agent Boddy claimed, these witnesses "lived abroad," so that the prosecution team would not bother to even try to contact them. (August 12 Tr. at 66-67). This, it is submitted, clearly is not true. The Southern District of New York and the FBI routinely investigate and contact witnesses internationally. It would be fair to say that they are experts in this area. The only reasonable conclusion here, it is submitted, is that Agent Boddy and the USAO intentionally did not obtain evidence of the use of Aberon for money laundering, including even attempting to contact these witnesses, because it was exculpatory to the Defendant, which is the same reason that the Devices were suppressed in this case for over one year, and that the Semen Kaplan Declaration was suppressed as well.

Finally, regarding the Semen Kaplan Declaration, the Court will recall that the defense found a draft of this Declaration on the Devices, addressed to the SEC, in which Semen Kaplan stated that all the funds in Aberon were his, from his successful business, that "I do not view myself as a victim" of Aberon, and that he agreed to "release and discharge Mr. Krigsfeld, [Aberon], on behalf of myself for any and all fraud, deception, misrepresentation or misappropriation in connection with their investments and loans." (Dock. No. 114-1, Semen Kaplan Declaration at ¶ 5). This Declaration is exculpatory on its face, stating that the purported "Investor-1" (which itself was false, Krigsfeld told the FBI that the funds in Aberon were from Leon Lann/Kaplan) does not consider himself a victim.

Finally, it is submitted that Agent Boddy's testimony showed a deliberate lack of preparation or investigation in preparation for the hearing on how and when he received this Declaration from the SEC and how and when he gave it to the USAO, and AUSA La Morte's presentation discussed below, it is submitted showed the same in a coordinated manner. Agent Boddy knew or should have known that the failure to provide the Semen Kaplan Declaration was going to be the subject matter of the hearing. Agent Boddy had worked with the USAO which drafted his Affidavit and Supplemental Affidavit with him, and Agent Boddy easily could have taken steps permitting him to have been definitive and forthcoming with the Court on exactly what occurred in receiving documents from the SEC, reviewing them, and providing them the USAO, including a comprehensive review and accounting of relevant FBI email. Instead, consistent with the testimony of AUSA La Morte, he determined to do little inquiry and preparation regarding the Semen Kaplan Declaration so that the evidence provided to the Court at the hearing plausibly could be vague. Nevertheless, despite the intentional lack of preparation and vague phrasing, Agent Boddy explicitly recalled that he received documents from the SEC, including the exculpatory Semen Kaplan Declaration, in or about April 2018, and that he believed that he provided it to the USAO by email sometime thereafter. (August 12 Tr. at 35-37, 42-44). The USAO offered no evidence of any inquiry in this regard, on who received it, or why it was omitted from the "share" drive as testified to by AUSA La Morte, although this determination would have been easily accomplished. Thus, the record stands here that the USAO had the exculpatory Semen Kaplan Declaration at the commencement of this prosecution, and never produced it until confronted with a draft that had been left by Krigsfeld on one of his previously withheld Device.

2. Testimony of AUSA Tara La Morte

AUSA La Morte's testimony, it is submitted, likewise was not credible in core respects.

AUSA La Morte joined the Department of Justice as an attorney in 2005, and has been an Assistant United States Attorney in this District since 2008. Thus, AUSA La Morte was a Justice Department attorney for well over a decade at the time that she was assigned to this case. (August 12 Tr. at 127, 131). AUSA La Morte is a highly experienced federal litigator and has handled very large cases for the government in federal court. (*Id.* at 128-129). It is not disputable that AUSA La Morte knew the discovery obligations of an AUSA in a federal criminal case, including the obligations pursuant to Rule 16 and *Brady v. Maryland*.

The record in this case is that AUSA La Morte knew at all times in this prosecution that that the only work computers and telephone, obtained from the only cooperating witness, who is the only alleged co-conspirator, were in the possession of the FBI. The record is that repeatedly, from January 2019 through January 2020, AUSA La Morte represented to this Court and the Defendant that: a) the Government understood its *Brady* obligation and there was no *Brady* material in the possession of the Government in this case; b) that all discovery pursuant to Rule 16, including all evidence regarding Aberon had been provided to the Defendant; c) that the Government was ready for trial, wanted to move this case quickly and that setting a trial date was appropriate; and d) represented to the New York State Court that all discovery had been provided and that the case was ready for trial in order to obtain a stay of state proceedings in that Court.

These all were inaccurate. AUSA La Morte's explanation for these inaccurate representations was two-fold. First, she claimed, she forgot about the evidence only to be reminded when the trial approached. (August 12 Tr. at 149). Second, AUSA La Morte, an over decade-long Justice Department attorney, claimed that she never asked the FBI Agent assigned to this case what evidence was in FBI possession, and that the Case Agent, himself of substantial experience and training, never told her. (*Id.* at 151-152). Each of the purported forgetting of core relevant

evidence, and the claim that a lead federal prosecutor did not ask what evidence has been gathered in a criminal prosecution for which she is responsible, on their own do not have a credible basis. That they are purported to have happened together is not plausible. And further adding to the lack of a basis in credibility is these inaccurate representations had the effect of suppressing exculpatory evidence of the use of Aberon for money laundering which was on the Devices, which is exactly the reason that FBI Agent Boddy, the other lead member of the prosecutorial team with AUSA La Morte, determined not to produce them. Therefore, it is submitted, the only conclusion from this evidence is that the Devices, believed to hold exculpatory evidence of the use of Aberon for money laundering, were purposely suppressed by the prosecutorial team to prevent the Defendant and his counsel from possessing this evidence in his defense.

Like Agent Boddy, AUSA La Morte provided conflicting and evasive testimony with repeated implausible claims of lack of memory. Yet the area of questioning at the hearing was well known to the witness, and reasonable preparation would have permitted AUSA La Morte (as well as Agent Boddy), and the Government, which was offered the opportunity to present evidence but declined, to provide definitive answers to how core and exculpatory evidence was withheld for over one year. Instead, each chose a course of deliberate lack of preparation, claims of lack of memory and evasion, to deprive this Court and the Defendant of the facts. Here are examples:

a. <u>Failure to Disclose the Semen Kaplan Declaration</u>

i. On October 3, 2018, in AUSA La Morte's presence, the sole cooperating witness Joseph Krigsfeld told her that essentially all the funds invested in Aberon, through Akros (99% of Aberon's funding) were from Leon Kaplan, a member of Russian organized crime.

Krigsfeld stated that Semen Kaplan acted as a front for Leon Kaplan in financial dealings. (Exhibit 6 at 5).

ii. The Semen Kaplan Declaration, consistent with Krigsfeld's statements on October 3, 2018, and which there is evidence Krigsfeld participated in drafting, was an act in furtherance of the use of Aberon as a money laundering vehicle. While the FBI was in possession of facts that the funds in Aberon were from Leon Lann/Kaplan, the Semen Kaplan Declaration appears intended to mislead the SEC into believing that the funds in Aberon were from Semen Kaplan, which was part of the money laundering scheme hiding Lann/Kaplan's involvement. Semen Kaplan in his Declaration then "released" Aberon and stated that he did not consider himself a victim, in an effort to exculpate a co-conspirator in the money laundering scheme and prevent any further government inquiry into money laundering by Krigsfeld, Semen Kaplan, Leon Lann/Kaplan and others. (Dock. No. 114-1).

iii. Agent Boddy testified that he sent the Semen Kaplan Declaration to the USAO before Defendant Jain was arrested.

iv. AUSA La Morte, in the same manner as with the Devices, testified that again a confluence of events, all implausible on their own, occurred simultaneously depriving her of knowledge of the existence of the Semen Kaplan Declaration and the failure to disclose this *Brady* material to the Defendant. First, even though

Agent Boddy gave the Semen Kaplan Declaration to the USAO, somehow it never made it to the "share drive" so AUSA La Morte did not know about it. (August 12 Tr. at 137-138). Further, although the Semen Kaplan Declaration states that in substance he is the sole owner of 99% of the funds in Aberon, and thus is "Investor-1," and that he does not consider himself a victim, and he "releases" Krigsfeld and Aberon, somehow neither Krigsfeld nor his lawyer, or the FBI which had taken possession of the Declaration and sent it to the USAO, ever mentioned it in the many meetings they all had together with AUSA La Morte. (*Id*. at 140). And, just like for the Devices, none of these many people or others at the USAO who received the Semen Kaplan Declaration from Agent Boddy ever told AUSA La Morte about it, even though she was the lead prosecutor of both Krigsfeld and the Defendant Jain. Furthermore, while, based on the Declaration of Semen Kaplan, he is Investor-1, and thus the victim in this case, he could not tell AUSA La Morte about the Declaration, because the prosecution team never even attempted to contact him. Like the unsupportable don't ask, don't tell, nobody mentioned, story about how the Devices were suppressed for over one year, this separate parallel implausible story was told at the hearing about AUSA La Morte's lack of knowledge of the Semen Kaplan Declaration and her failure to produce it. It is submitted, therefore, that the evidence establishes that the prosecutorial team

deliberately did not produce the Devices and the Semen Kaplan Declaration for the same reason, because they were exculpatory evidence to Niket Jain, showing that, unbeknownst to Jain, Krigsfeld and the purported "Investor-1" actually were engaged in a money laundering scheme using Aberon. This was the intentional suppression of *Brady* material

v. AUSA La Morte's testimony regarding her interactions with the SEC after purportedly being told of the Semen Kaplan Declaration show that she purposefully attempted to avoid receiving evidence of the intentional suppression of *Brady* material. AUSA La Morte's testimony shows that rather than investigate the circumstances surrounding the failure to disclose the *Brady* material, which in innocent circumstances immediately would be done, in her interactions with the SEC she purposefully avoided personally obtaining evidence proving that the USAO and FBI had been in possession of the exculpatory evidence since the commencement of this prosecution. Specifically, after receiving the Devices, the defense located a draft of the Semen Kaplan Declaration not marked as "privileged" on the Devices (most of the other drafts and apparently the signed version were marked privileged), and the Defendant brought the existence of the Declaration to the attention of the Court. At the August 12, 2020 hearing, AUSA La Morte testified that following this, she contacted the SEC to determine

whether it had a copy of the Declaration, which of course it did. (August 12 Tr. at 138-139). At the hearing, AUSA La Morte first testified that she asked the SEC whether it had been produced to the prosecutorial team, and was told no, because it was in a separate file, which AUSA La Morte then did not ask about. (*Id.* at 139). When asked further, however, AUSA La Morte, literally answering both "yes" and "no," stated that in fact she had not asked the SEC whether they had produced the Semen Kaplan Declaration to the prosecutorial team. Conceding that she never asked this question directly, she testified only that she was told that the Declaration had been put in a "separate" place. (*Id*.). This conduct, it is submitted, is not explainable other than as a purposeful avoidance of directly learning detrimental facts. Therefore, in short, the Semen Kaplan Declaration: a) is exculpatory evidence; b) the Government failed to produce it; and c) if AUSA La Morte, the USAO or the FBI had inadvertently not disclosed it, rather than intentionally, they would have immediately and definitely found out the facts and would have been prepared to report them to the Court at this hearing in a forthright manner. They did not do so. This further establishes that the suppression of this evidence was intentional.

b. <u>Failure to Disclose the Devices</u>

Similarly, AUSA La Morte's testimony regarding discovery of the Devices, it is submitted, was not credible. For AUSA La Morte to fail to disclose the Devices for over one year, all of following - each implausible on its own - would have had to have occurred. First, a highly

experienced AUSA, *for over one year*, would have to not ask the investigatory agency on the prosecutorial team what evidence was in its possession relevant to the investigation and case. This is not possible. The Devices included Aberon work computers. An AUSA would want to know all the evidence, because the AUSA wants all the available evidence of the crime charged, and would have asked every time.

Second, without making any inquiry on what evidence existed, and thus having no basis to believe that the AUSA is aware of all evidence gathered in the investigation, the AUSA, repeatedly, *for over a year* represented to the Court and the Defendant that all discovery in the possession of the Government was provided, and that the Government is aware of no *Brady* material.

Third, the AUSA actually knew about the Devices. The AUSA was present when they were first discussed with Krigsfeld, and was on emails relating to their seizure and a privilege agreement. Thus, the explanation of the Government in this case requires the AUSA to have suffered amnesia about basic evidence *for over one year*, regarding the only Aberon work computers and only telephone from the only cooperating witness who was the only alleged co-conspirator.

Fourth, the AUSA's supervisor and former lead attorney on this investigation knew about the Devices. The Government's explanation requires that he never said anything either.

Fifth, the Government's explanation requires that Agent Boddy act in concert, by purportedly never mentioning or even looking at the Devices, because, without any discernable basis, he was waiting until the trial was over in this case to look at the devices, even though he moved to a different FBI group, transferred the case and never told his successor agent about the Devices.

Sixth, all this requires the participation of the cooperating witness, Krigsfeld himself, and his lawyer. They knew about the Devices (as well as the Semen Kaplan Declaration). For all this to have occurred, they must meet with the Government repeatedly but keep silent about this basic evidence, for over one year.

Seventh, the prosecution team produced no evidence in this case that Aberon was used as a money laundering operation by the Defendant's purported co-conspirator together with Individual-1, which is exculpatory to him. The withheld evidence was the same exculpatory evidence, in both instances, on the Devices and in the Semen Kaplan Declaration.

Therefore, it is submitted that the evidence at the hearing further established that the Krigsfeld Devices and the Semen Kaplan Declaration were intentionally suppressed to deprive the Defendant of exculpatory evidence for use in this case.

Further, the explanation of how AUSA La Morte supposedly "remembered" the Devices also, it is submitted, is not credible. AUSA La Morte claimed that after over one year, she then "remembered" the computers and telephone because Krigsfeld, on January 28, 2020 mentioned a recording of the Defendant Jain on the seized telephone. (August 12 Tr. at 153-154). But there is no reference to this in the FBI 302 from the January 28, 2020 interview (Exhibit 9), even though discussion of a recording made by the cooperating witness of the Defendant, which purportedly was previously unknown, obviously would have been in the report if it had occurred.

c. Disclosure of the Devices

Finally, when the Government determined in February 2020 that with the trial approaching in March, and Krigsfeld as the central witness, it was not tenable to further suppress the devices because Krigsfeld may mention them from the stand. The Government then decided to disclose them. The Government first tried to do so without providing evidence that the withholding had been intentional by using additional misleading representations. The events were as follows:

Sometime after January 28, 2020, AUSA La Morte, determining that she needed to now produce the Devices, sent AUSA Raymond a copy of the October 9, 2018 email showing that AUSA La Morte had known of the Devices since that time, well over one year. (August 12 Tr. at 189). On February 12, 2020, AUSA La Morte and AUSA Samuel Raymond together contacted defense counsel and disclosed the existence of the devices. ((Exhibit 14 at 1). The next day, February 13, 2020, AUSA Raymond and AUSA La Morte sent the Court the letter, which is Exhibit 14 at the hearing. AUSA La Morte had informed AUSA Raymond prior to the sending of the February 13, 2020 letter that she had known about the Devices since October 2018.

The Government's February 13, 2020 letter to the Court stated that "[i]n reviewing materials in preparation for trial, the Government recently learned that it was in possession of additional materials subject to disclosure pursuant to Federal Rule of Criminal Procedure 16," and, specifically to the Krigsfeld Devices, that "the government also learned recently that the FBI has in its possession certain electronic devices belonging to 'Individual-1,' but the Government has not produced materials from these devices." (Exhibit 14 at 1).

The February 13, 2020 letter representing to the Court and Defendant that the Government "learned recently" of the Devices hid from the Court and Defendant that the USAO had learned of the Devices one and one-half years earlier, in October 2018, and been part of the decision and coordination of the receipt of the Devices. (Exhibit 14 at 1). The letter further states that the Government "will not oppose" a request for an adjournment of the trial date if requested by the Defendant. (Exhibit 14 at 1).

At the August 12, 2020 hearing, AUSA La Morte was shown the February 13, 2020 letter. AUSA La Morte was directed to the portion of the letter, which bore her name, in which the Government inaccurately represented to the to the Court that the Government had only "learned

recently" of the Devices, when she knew this to be untrue. (August 12 Tr. at 188). AUSA La Morte claimed lack of memory of this portion of the letter. (*Id.*). She further claimed that she did not understand what AUSA Raymond meant by the representation that the Government had "learned recently" of the devices. (*Id.* at 188-189).

This testimony was evasive and, it is submitted, untrue. AUSA La Morte had personal knowledge of the events, was the lead prosecutor, and AUSA Raymond had entered this case by filing a notice of appearance moments before this February 13, 2020 letter was filed. (Dock. No. 62). It was written on AUSA La Morte's behalf as well and her name appears under the signature line. It is submitted that there is no reasonable conclusion for the representation in the February 13, 2020 letter that the Government had "learned recently" about the Krigsfeld Devices other than that AUSAs Raymond and La Morte determined to attempt to hide from the Court and Defendant that the Government had been aware of the Devices during this entire prosecution. (*See* Exhibit 14 at 1).

It is submitted that the purpose of this misrepresentation on February 13, 2020 was to deprive the Defendant and the Court of facts that could be the basis of for motions, and increase the possibility that neither the Court nor Defendant would inquire further. The Government's effort, based on this letter referencing a previous call with defense counsel, was to have the trial date moved on the Defendant's request and with the consent of the Government with no inquiry regarding the delayed production of the Devices. However, instead of simply requesting an adjournment, by letter to the Court filed on February 19, 2020, the defense stated its intention to make a motion based on the late disclosure. (Dock. No. 66). This led to the Court on February 26, 2020 directly asking the Government for the circumstances of how the late disclosure happened. The Government then, on this date, disclosed that the USAO actually had known of

the devices previously, which led to additional motion practice and eventually the August 12, 2020 hearing. Thus, the record from the hearing is that after the decision to produce the Devices was made in approximately early February 2020, the Government first determined to attempt to withhold the fact that it had known about the Devices during the entire prosecution, in an effort to have the Defendant request that the trial date be moved, without possession of this information. When that did not work and the Court asked the Government directly for the circumstances, the Government on February 26, 2020 disclosed the information. Thus, it is submitted that the record reflects a misrepresentation in the February 13, 2020 letter from the Government that it "learned recently of the Devices," it was done to prejudice the Defendant, and when asked about this at the August 12, 2020 hearing AUSA La Morte, again, implausibly claimed lack of memory, and implausibly that she did not know what AUSA Raymond could have meant by the words, "learned recently." The term is clear, and, it is submitted, the response evasive and not credible.

In sum, the object of the hearing was to determine whether the withholding of the Krigsfeld Devices for over one year was deliberate. The evidence adduced at the hearing, and evidence set on the record previously in this matter, shows that the answer to this is yes.

## I

## THE INDICTMENT SHOULD BE DISMISSED FOR A VIOLATION OF DUE PROCESS, THE DEPRIVATION OF THE COUNSEL OF CHOICE AND PURSUANT TO THE SPEEDY TRIAL ACT

The Defendant previously submitted to the Court briefing in support of his motion to dismiss the Indictment for the deprivation of the right to counsel of choice and pursuant to the Speedy Trial Act. The Defendant respectfully relies on this briefing, and adds that dismissal pursuant of the Indictment is additionally supported by the evidenced adduced at the August 12, 2020 hearing.

As set forth above and previously, the prosecution team in this case deliberately withheld evidence for over one year. The evidence was believed to be and in fact was exculpatory to the Defendant. The prosecution team resisted investigation of the circumstances of the withholding of this evidence, culminating in explanations and testimony at the August 12, 2020 hearing that lacked a credible basis in material respects and was not forthcoming. For these reasons, the Indictment in this case should be dismissed not only for the deprivation of the right to counsel of choice and on speedy trial grounds, but on Due Process grounds as well.

*Brady v. Maryland* "requires that the government disclose material evidence favorable to a criminal defendant." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012). Evidence is favorable if it is either exculpatory or impeaching, and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)).

Dismissal of an indictment is warranted to "(1) eliminate prejudice in a criminal prosecution, or (2) correct a pattern of prosecutorial misconduct," *United States v. Palmisano*, 104 F.3d 354 (2d Cir. 1996), or if misconduct is deliberate. *See Government of Virgin Islands v. Fahie*, 419 F.3d 249, 254-55 (3d Cir. 2005) ("[D]ismissal for a *Brady* violation may be appropriate in cases of deliberate misconduct because those cases call for penalties which are not only corrective but are also highly deterrent. Deliberate misconduct is targeted for extra deterrence because we expect willful misbehavior to be the most effectively deterred by enhanced penalties."). To be deliberate conduct warranting dismissal, governmental conduct need not be "intentional or malicious," but "'reckless disregard for the prosecution's constitutional obligations' is sufficient to give rise to flagrant misconduct." *United States v. Bundy*, 2020 WL 4517572, *15 (9th Cir. Aug. 6, 2020) (dismissing indictment and holding, *inter alia*, that the government violated its

*Brady* obligations when it failed to produce exculpatory evidence held by the FBI). In that regard, the Government may not seek "to absolve itself of wrongdoing for other agencies' failures," because "to the extent that any government agencies or actors, through their own flagrant misconduct, failed to make known exculpatory information, the flagrant nature of such conduct will be imputed to the prosecution—just as the agencies' or actors' *Brady* violations are imputed to the prosecution." *Bundy*, 2020 WL 4517572 at *14. In this case, the Government has stipulated that Agent Boddy was part of the prosecutorial team (August 12 Tr. at 194). Indeed he was the leader of the team along with AUSA La Morte.

It is further well established that the "prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *United States v. Connolly*, 16 Cr. 370 (CM), 2019 WL 2120022, *13 (S.D.N.Y. May 2, 2019); *Mahaffy*, 693 F.3d at 133 (government failed to comply with *Brady* when "the prosecution team either actively decided not to disclose the SEC deposition transcripts or consciously avoided its responsibilities to comply with *Brady*"); *United States v. Meregildo*, 920 F.Supp.2d 434, 445 (S.D.N.Y. 2013) ("The Government cannot avoid its *Brady* obligations by being willfully blind to the information in front of it.").

The record in this case shows that the Government's misconduct in intentionally suppressing for over one year evidence that the prosecution team knew, or should have known, was exculpatory merits dismissal of the Indictment. The record further shows that a lead member of the prosecution team from the FBI had determined to suppress exculpatory evidence until it could no longer be of use to the Defendant. The record is one of deliberate withholding of evidence, and then implausible and not credible explanations to attempt to justify the suppression of evidence for longer than this case should have taken to complete without governmental

improper conduct. The Defendant was prejudiced in his right to a speedy trial, incurred expense, the deprivation of counsel of choice, and, having only received huge amounts of the most important discovery material over one year after his arrest, including exculpatory information, was irreparably deprived of the chance to within a reasonable time use exculpatory information and all the information on the Krigsfeld Devices to investigate this case and defend himself. Therefore, it is respectfully requested that the Indictment be dismissed.

## II

## THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE *BRADY* MATERIAL

The Argument in this Section is respectfully submitted to the Court under seal in a separate filing.

## III

## THE COURT SHOULD ORDER PRODUCTION OF GRAND JURY MINUTES FOR ITS *IN CAMERA* INSPECTION

The Indictment in this case alleges a conspiracy and a scheme to defraud two investors. Based upon the discovery, "Investor-1" invested 99% of the funds, and another investor, "Investor-2," Alex Hurst, invested 1% of the funds, approximately $240,000, and asked for and received his entire investment back with the represented gain.

The August 12, 2020 hearing disclosed and confirmed that throughout this case the Government intentionally withheld evidence in its possession that Aberon was a money laundering vehicle, and that virtually all the funds came from a single source, Russian organized crime member Leon Lann/Kaplan, who supplied 99% of the funds. It is apparent from the August 12, 2020 hearing that just as this information was withheld from the Defendant by the Government, this evidence was withheld from the Grand Jury, and instead the Grand Jury was misled by the

omission of evidence on the identity of the actual person purportedly defrauded in a scheme to defraud "Individual-1."

Based on the information at the hearing, and the discovery, it cannot be known whether the Government indicted the Defendant as having had a scheme to defraud Invester-1 as Leon Lann/Kaplan in substance, or whether based upon the use of Semen Kaplan as a front for Leon Lann/Kaplan, it used Semen Kaplan as the person who was in substance Investor-1, or whether, as Agent Boddy stated, the "Mom," Victoria Krain, was presented as the beneficial owner and thus the defrauded Investor-1.

Under these circumstances, it is respectfully requested that the Court order an *in camera* review of the Grand Jury minutes on the subject of whether any evidence was presented on the identity of the beneficial owner of an entity that is denominated as "Investor-1" in the Indictment. This is necessary because it would be a denial of due process in this case for the Defendant to be tried for defrauding a purported unidentified victim, when the Government possesses large amounts of evidence on the identity, but did not present it to allow it to change its theories on who was the object of the scheme to defraud in the Indictment. This device would permit the Government to change and craft its theory at trial of who Investor-1 was to avoid the Defendant's defense, and seek to convict him for a crime not presented to the Grand Jury. For example, if the Defendant presents evidence that there was no scheme to defraud Leon Lann/Kaplan because he sought the reporting at issue, the Government would say no, Semen Kaplan was the object of the scheme to defraud. If the Defendant then presents evidence that Semen Kaplan sought the reporting at issue, and was not the object of a scheme to defraud, the Government will say, no, it was the "Mom." And so on, to attempt to convict the Defendant of a scheme to defraud a person never identified or known to the Grand Jury.

In *United States v. Hoey*, No. S3 11-CR-337 PKC, 2014 WL 2998523, at *3–4 (S.D.N.Y. July 2, 2014), this Court held that the Defendant had shown a particularized need for the Court to perform an *in camera* production of grand jury material, because the Defendant presented reason to believe that he had not been properly charged, and that without such review it was not possible to determine whether the Defendant had been properly charged. As this Court summarized "'It is well-settled that a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations .' *United States v. Forde*, 740 F.Supp.2d 406, 413 (S.D.N.Y.2010) (citing *United States v. Moten*, 582 F.2d 654, 662 (2d Cir.1978)).'"

Here, at the August 12, 2020 hearing alone, three different versions of the beneficial owner that is Investor-1 were in the record. Krigsfeld, the only known cooperating witness and alleged co-conspirator, stated on October 3, 2018 that Leon Lann/Kaplan provided the funds that are called the "Investor-1" investment, and thus is the beneficial owner and the object of the purported scheme to defraud. The long-suppressed Semen Kaplan Declaration, submitted on behalf of Krigsfeld at the SEC, however, says that Semen Kaplan is the sole beneficial owner. Agent Boddy, though, who it is inferable provided the testimony at the Grand Jury resulting in the present Indictment, testified at the August 12, 2020 hearing that the "Mom" was the beneficial owner and the investment was from the proceeds from her property. This discrepancy on the identity of the beneficial owner purportedly defrauded as "Investor-1" is because it was a money laundering transaction designed to hide the source of the funds, which cannot be used to permit the Government to provide no information to the Grand Jury on the identity of the aim of the scheme to defraud, in order to modify that aim at trial to avoid the Defendant's defense.

Thus, a particularized need to inspect the Grand Jury to determine whether any person was presented to the Grand Jury as the beneficial owner and thus whether anyone was identified as the victim, and if not, the Indictment should be dismissed because it permits the Government to pick its victim at trial, and attempt to convict the Defendant for a crime not presented to or indicted by the Grand Jury.

## CONCLUSION

For these additional reasons, it is respectfully requested that the Indictment against Defendant Niket Jain be dismissed or, if this case continues, that an Order be issued for the production of *Brady* material and for the production of Grand Jury minutes for the Court's *in camera* review.

Dated: New York, New York
August 26, 2020

**EMMET, MARVIN & MARTIN, LLP**

By: /s/ Paul T. Weinstein
Paul T. Weinstein (PW-8716)
120 Broadway
New York, New York 10271
(212) 238-3000
*Attorneys for Defendant Niket Jain*